Leta Blanche PAINTER, Respondent,

v.

KNAUS TRUCK LINES, INC.,
a Missouri Corp., Appellant.

No. 49906.

Supreme Court of Missouri,

Division No. 2.

Jan. 13, 1964.

Motion for Rehearing or for Transfer to
Court En Banc Denied Feb. 10, 1964.

Hunter, Chamier & Motley, Moberly, for appellant.

Edwards, Hess & Collins, Macon, Bollow, Crist & Oswald, Shelbina, for respondent.

PRITCHARD, Commissioner.

In this personal injury action, which is the result of an automobile-truck collision, defendant appeals from a judgment for plaintiff based upon the verdict of a jury in the amount of $24,500.

■ Inasmuch as defendant first complains that plaintiff made no submissible case on her sole theory that defendant, by its driver, Kern, failed to keep its westbound truck on the north half of the east-west highway, but instead drove it onto the south half of the highway when the eastbound Valiant automobile operated by plaintiff was approaching so closely as to constitute an immediate hazard, we set out the facts in their light most favorable to plaintiff, and disregard defendant's evidence except insofar as it may aid the plaintiff. Christie v. Gas Service Company, Mo., 347 S.W.2d 135, 137 [1].

On the fateful day, April 26, 1961, of the collision between plaintiff's Valiant automobile and defendant's tractor-trailer truck, plaintiff had driven her husband to the schoolhouse where he worked in Paris, Missouri, at about 1:00 P.M. She went to a department store in Paris, then started to

go to the IGA store, but decided she would go on out to "White's Delight" on U.S. Highway 24 to meet a friend and to get something to eat. When she arrived there traffic was coming from behind her, from the south and from the west on Highway 24, and rather than stop traffic, she went west three miles on Highway 24 to the Mark Twain Cafe where she turned around and started back east. As she came to a hill just east of the Mark Twain Cafe and started down she saw defendant's truck coming from the east down a hill at a speed of sixty-five miles an hour. Plaintiff was then driving in her lane on the south side of the highway about forty-five miles an hour, and she saw the north part of the truck go off of the north side of the highway "Somewhere about Junior Hogan's house" (defendant's vehicle came to rest in the front yard and ditch of Hogan's house after the collision which occurred some 234 feet to the east). Then the truck came back onto the highway and crossed the center line at a time when plaintiff was 100 to 300 feet to the west of the truck when she was about Junior Hogan's house, but she did not know whether she was east or west thereof. At this point the paved portion of the highway is 22 feet wide, with shoulders 10 feet wide on the north and 11 feet wide on the south. Plaintiff remembered taking her foot off of the accelerator when the truck crossed the center of the highway. She did not remember anything thereafter concerning the collision, and her physician described this as amnesia in this case—a partial loss of memory of unpleasant facts.

On cross-examination plaintiff stated she did not know where her car was, which side of the center line it was on when the accident occurred, and she did not know whether she put on her brakes, or swerved to the left. Plaintiff had driven a car since 1933 to town on errands, out to her folks and to her sister's.

Witness Highway Patrolman Swartz, who arrived at the scene of the collision at 3:05 P.M., having been called thereto at 2:45 P.M., testified that he found scraped places on the pavement 4½ feet north of the center line, with tire marks southeast and east leading up to the rear of the Valiant which was headed northeast in the north lane 126 feet east of the scraped places, and witness Sheriff Bodine substantiated that testimony. Bodine also testified that there were two dark tracks that started in the south lane and went in a northeast direction across the center line to the scraped place. Witness Clyde Ragsdale, driving east, came upon the scene of the collision just as defendant's truck was going south across the highway towards Hogan's front yard. He saw a very faint track, two marks parallel to each other in the south lane, the left mark was three and a half feet south of the center line, which looked to him like the car (probably plaintiff's car) had gone to the north or northeast, and from the west end of the tire marks to the point where they turned northeast it was five feet shorter than the rail in front of the jury box.

With respect to the debris on the highway near the point of the collision, the testimony conflicted, but some of plaintiff's witnesses who were at the scene of the collision prior to and at the time some of the debris was being kicked off to the south of the highway to permit traffic to go through testified favorably to plaintiff concerning the location of debris prior to its being moved. Witness Ragsdale testified he saw quite a lot of debris on the south side of the middle line. Alva Clem testified most of it was on the south side of the division. Lester Skaggs, who started flagging cars at the scene just after the collision happened, testified that at that time all of the debris was on the south side of the road. Julius Earl Gill saw a lot of debris on the road, the bulk of which was in plaintiff's eastbound lane—there was some over the black line too. Lindell Hollensteiner testified there was debris in both lanes of traffic, and the majority of it was in the eastbound lane. Raymond Hogan testified that the biggest percent of the debris, being parts off of both vehicles, was located on the south side of the center line. Jack Wills testified that he (with others)

kicked a little bit of the debris, which was located on the south lane of the highway, off the highway. Highway Patrolman Swartz testified he did not recall any debris scattered about the pavement in the general area where the scraped mark on the pavement was, but there was probably more debris south of the center line. According to other witnesses, Swartz arrived at the scene after some of the debris had been moved off the highway.

Corroborating plaintiff's direct testimony that defendant's truck first went off of the north side of the highway prior to the time it came over the center line into plaintiff's lane of travel when she was 100 to 300 feet away from it, were the observations by several witnesses of dual tire marks on the north shoulder just east of where plaintiff's Valiant came to rest. Ragsdale testified there was a dual mark in an arc which went off the road and came back on not very far east of the Valiant. Guthrie testified there was a dual wheel mark from a truck on the north shoulder which began east of the Valiant and went up past it a little ways and disappeared. Sheriff Bodine testified there were two dual wheel tracks running on the north half of the road and shoulder, running either easterly or westerly quite a way up from the Valiant, and the tracks could be seen on the driving portion of the road where the brakes were applied. Wills' testimony was that there was a dual wheel mark 50 feet east of the Valiant and on the north shoulder where a vehicle had left the highway and had come back on it.

The photographs of the Valiant made after the collision show the left front end and side thereof to be more severely damaged, and the right front wheel thereof appears to be turned to the left. The front view of defendant's tractor, taken at the point where it came to rest, shows its left front bumper to be broken and badly damaged, and the front wheels are cramped to the right.

Section 304.015, subd. 2, RSMo 1959, V.A.M.S., provides, "Upon all public roads or highways of sufficient width a vehicle shall be driven upon the right half of the roadway, * * *."

From the foregoing facts which were directly testified to by the plaintiff, the jury could reasonably find that as these two vehicles approached each other at a combined speed of 110 miles per hour, or approximately 165 feet per second, defendant's truck went off the north edge of the pavement and then came back onto the pavement and travelled across the center line at a time when plaintiff's Valiant was 100 to 300 feet away, thus confronting plaintiff, who was then travelling in her lane with her left wheels 3½ feet south of the center line, with an apparent danger of collision for which she had from .6 to 1.8 seconds to attempt to avoid. Thus the jury could have reasonably found that defendant's driver violated said Section 304.015, subd. 2, at a time when such violation constituted the proximate cause of the collision and plaintiff's injuries. While there is circumstantial and somewhat conflicting evidence as to the point of impact, the evidence of the negligence of the driver of the truck in crossing the center line is direct and the same occurred prior to the impact. This establishes the plaintiff's case. Whatever plaintiff may have done after she was suddenly confronted with the danger of collision has no bearing on the issue of whether plaintiff made a submissible case upon her sole theory that the truck driver failed to keep his vehicle on the north (right) half of the highway, and drove it to the south half thereof when plaintiff was approaching so closely as to constitute an immediate hazard.

Cases under the "rule of the road" statutes, which required a driver to operate his automobile as far to his right side of the highway as practicable and which were in effect prior to the 1953 enactment of said Section 304.015, subd. 2, are helpful here.

In Biggs v. Crosswhite, 240 Mo.App. 1171, 225 S.W.2d 514, 519 [1], it was said:

"This statutory 'rule of the road', Sec. 8385(b), RSMo 1939, Mo.R.S.A., is not confined to the exact point of collision, but would embrace the entire course of departure from and return to the right-hand side of the road where such deviating course is shown likely to have caused confusion in the minds of drivers of approaching vehicles as to the ultimate course of the car so deviating and thus causing or contributing to the cause of the collision."

See also the cited cases in Biggs: La Pierre v. Kinney, 225 Mo.App. 199, 19 S.W. 2d 306, 310; Roberts v. Atlas Life Ins. Co., 236 Mo.App. 1162, 163 S.W.2d 369, 373.

■ Here, the jury could find from the direct testimony of plaintiff that defendant's truck came over onto her side of the highway, then, from all the circumstances in evidence (the scraped place in the north lane and the tire marks leading up to it rather sharply from the west, the fact that the wheels of plaintiff's car were turned to the left and those of defendant's tractor were turned to their right when both vehicles came to rest, then plaintiff's tracks continued southeasterly and easterly to the resting place of her Valiant, and defendant's truck tracks went north to the north shoulder then southwesterly to where it came to rest in Hogan's front yard and ditch), that the impact occurred 4½ feet north of the center line, but that plaintiff veered sharply to her left to avoid defendant's truck which turned to its right and back toward its own lane. The fact that the collision might have happened in the north lane does not relieve defendant of its liability for negligence in crossing the center line from its right half of the roadway at a time when both vehicles were approaching each other at their combined speed of 110 miles per hour and when they were 100 to 300 feet apart, plaintiff being then in her own lane. These are questions for the jury, and they do not, under this record, require speculation and guesswork, nor is it required that the jury pile inference upon inference to reach its ultimate conclusion of defendant's negligence in crossing the center line. The foregoing facts and circumstances demonstrate clearly that there is no "void" in plaintiff's evidence as to the movement and the relative positions of the two vehicles immediately prior to the collision, for which contention defendant relies upon Schoen v. Plaza Express Co., Mo., 206 S.W.2d 536, in which the direct and circumstantial evidence was held to be insufficient to show the position or the movement of the defendant's truck upon the highway with reference to the right-hand side thereof. See also defendant's cited case of Borrini v. Pevely Dairy Co., Mo.App., 183 S.W. 2d 839, 844 [6].

The trial court did not err in overruling defendant's motion for directed verdict and in submitting this case to the jury upon plaintiff's aforesaid theory of defendant's negligence.

We turn now to defendant's claimed errors in the giving of instructions numbered 1 and 6 for the plaintiff.

■ Instruction 1 required the jury to find that defendant's driver, Kern, was operating a tractor-trailer unit in a generally westerly direction, and plaintiff was operating a Valiant automobile in an easterly direction, on U.S. Highway 24, that a collision occurred between the two vehicles on the roadway which was of sufficient width to permit Kern to drive upon the right or its north half, that he failed to do so but instead drove onto the south one-half of said highway at a time when said Valiant was approaching so closely as to constitute an immediate hazard. The jury was then required to find that these acts were negligent and that such negligence proximately caused the collision and resultant injuries to plaintiff, and further required the jury to find that plaintiff was not negligent under Instruction A (plaintiff's contributory negligence) and Instruction F (plaintiff's negligence under defendant's counterclaim).

Defendant first says that Instruction 1 is not supported by the evidence or the reasonable inferences deducible therefrom in that the plaintiff produced no circumstantial evidence that the truck crossed the center line "so closely as to constitute an immediate hazard" ; that such clause must reasonably be interpreted to mean that defendant's truck crossed the center line at such an angle that its course, when extended in time and space, would collide with plaintiff's Valiant wherever it was, that the record is silent as to the angle at which the front of the truck crossed the center line, how long it remained over the line, or how far it travelled over the line. This contention is without merit. The evidence shows that defendant's truck went off the north edge of the pavement in an arc some fifty feet east of where the Valiant came to rest (this being 126 feet east of the scraped place which the jury could have found was the point of impact), then travelled back onto the north lane, crossed it, then came over the center line when plaintiff was in her lane 100 to 300 feet away. It is true that plaintiff did not remember anything after the truck crossed the center line, but the jury could reasonably infer from the circumstantial evidence above mentioned, that by reason of Kern's failure to keep the truck on the north half of the highway within the time and distance between the two vehicles they then were on a collision course, even though the impact may have occurred 4½ feet north of the center line, and that the act of Kern in crossing the center line constituted negligence which proximately caused the collision. The jury under this instruction would necessarily be limited to the testimony of plaintiff concerning the speeds and distance between the vehicles at the critical time that defendant's truck came from its north lane across the center line in order that it might find that the same occurred when plaintiff was approaching so closely as to constitute an immediate hazard. See Harris v. Hughes, Mo.App., 266 S.W.2d 763, where under a Kansas statute similar to Section 304.015, subd. 2, supra, an instruction submitting acts of the defendant there in failing to remain on his east half of the highway, but instead drove onto the plaintiff's west half thereof, was approved. See also Miles v. Gaddy, Banc, Mo., 357 S.W.2d 897, 902 [5], where it is said that in case of a statutory violation, it is generally sufficient to couch the verdict-directing instruction substantially in the language of the statute. This was done in this case by Instruction 1, except that the additional finding was included that Kern's negligence occurred while plaintiff was approaching so closely as to constitute an immediate hazard. Certainly, defendant may not effectively claim prejudicial error in this latter additional burden assumed by plaintiff.

Defendant next claims that Instruction 1 in effect required the jury to find that defendant came across the center line and hit plaintiff's Valiant on her side of the road. Suffice it to say that the instruction requires the jury to find that a collision occurred, and it does not specify that it took place in the south lane of the highway, although from the circumstantial evidence of the location of most of the debris the jury could reasonably find that the impact did occur in the plaintiff's lane of travel.

Under Instruction F, given by the court for defendant on its counterclaim for damage to its tractor-trailer unit, defendant's theory was that plaintiff drove the Valiant to her left and into defendant's proper westbound lane so as to cause the same to collide with defendant's tractor and trailer unit. Instruction 6, here attacked by defendant, required the jury to find that plaintiff was driving her car without negligence on her part on the south half of the highway, and that she was suddenly confronted with the defendant's truck approaching her on the south side of the highway and in such close proximity that the plaintiff did not have sufficient time to determine with certainty the best and safest course to pursue, and that she turned her car to the left to avoid the collision, exercising such care as a very prudent and careful driver would have exercised under the circumstances then and

there existing, then plaintiff was not negligent in failing to operate and keep her car on the right half of the highway and defendant was not entitled to recover of plaintiff on the counterclaim on that assignment of negligence.

 Defendant claims that the submission of Instruction 6 is beyond the scope of the pleadings. However, the matter of the emergency is not required to be pleaded as an affirmative defense. There is no confession here of plaintiff's negligence and an avoidance thereof. The instruction requires the jury to find that plaintiff was operating her car without negligence. In Jones v. Hughey, Mo., 283 S.W.2d 550, 552 [1–3], the court said:

> "The emergency doctrine is not a defense and a defendant is not automatically exonerated because an emergency existed. The doctrine is a principle of law which means the fact that action was taken in an emergency is a factor that may be considered in determining the reasonableness of the action. Rohde v. St. Louis Public Service Co., Mo.Sup., 249 S.W.2d 417."

Defendant's further contention is that the hypotheses in Instruction 6 that defendant's truck was "approaching her upon the south side of the highway" and that she "turned to the left to avoid the collision" are not supported by the evidence. This contention is not well taken. Reference to plaintiff's evidence shows that the truck crossed into her lane when she was 100 to 300 feet away and at a closing speed of some 110 miles per hour. If these facts are true, as the jury must have believed, then defendant was approaching plaintiff on the south side of the highway. There was also ample evidence, above stated, circumstantial in nature, that plaintiff veered sharply to her left just shortly before the impact, and defendant's driver, Kern, also testified that the plaintiff made a sharp turn across the center line, and from this circumstantial and direct evidence the jury properly could infer that the conduct of defendant's driver in so crossing the center line induced plaintiff to make an emergency turn to her left to avoid the collision. Brawley v. Esterly, Mo., 267 S.W.2d 655, 660 [8]; Filkins v. Snavely, 359 Mo. 356, 221 S.W.2d 736, 738 [3–5].

The discussion above concerning Instruction 1 shows that the theory therein submitted to the jury is not inconsistent with the theory of sudden emergency submitted as a defense to defendant's counterclaim in Instruction 6, as contended by defendant, because Instruction 1 did not require the jury to find that the collision occurred in the south lane, or exclude a finding that it did occur in the north lane. The ground of negligence (necessarily reiterated throughout this opinion) relied upon by plaintiff in Instruction 1 is simply that defendant's truck crossed the center line when plaintiff was approaching so closely as to constitute an immediate hazard.

Under all of the direct and circumstantial evidence in this case, the court did not err in the giving of Instruction 6.

The medical evidence in this case shows that plaintiff, Mrs. Painter, being 48 years old at the time of trial, and being previously in good health, had a life expectancy of 30.-44 years. She was unconscious at the accident scene, and when she was taken to the hospital, where she remained for 47 days, she was in profound shock in which she remained for three days, during which time she showed gradual improvement in her condition of shock. She suffered a severe brain concussion from which she made good recovery, but she now has severe headaches. During the time she was in the hospital, her chest cavity filled with blood, but it took care of itself, as did a condition of paralytic ileus although plaintiff testified she still had constipation trouble at the time of trial. There was a separation of the 8th, 9th and 10th costal cartilages where the ribs join the breast bone, which, according to plaintiff's physicians, is a permanent, pain producing injury. There was a comminuted fracture of her left knee which necessitated surgery for a complete removal of the knee-

cap, which causes an instability of the left knee with lack of strength in the ligaments of the knee joint, with limitation of motion thereof, a permanent condition.

Plaintiff's left ankle was fractured through both malleoli, with displacement of fragments which required wires and screws to hold into place. The screw placed by the surgeon in the bone of plaintiff's ankle still remains therein and this area is still quite tender. As a result of the fracture and subsequent healing thereof, plaintiff's foot is everted to the outside with a deformity, which plaintiff will never overcome, in the foot and ankle. Arthritis has started to develop in the ankle and the prognosis is that it will continue to do so. There were multiple dislocations of the bones of the left foot, and the second metatarsal was fractured, all of which required pins and traction to reduce because of torn ligaments. After reduction of the bones of the foot a plaster cast was applied. There is arthritis developing in the joint spaces of the foot, with decalcification of the bones and deformity. The pain is permanent, and there is a permanent injury to the ligaments of the foot.

Plaintiff testified that she was in a wheel chair until Christmas during which time she also used two crutches, then she used one crutch until April or May, 1962, at which time she wore bowling shoes for support and comfort. She cannot walk without shoes, she limps, and the ankle and knee are weak, with severe pain all the time. She has three scars on her foot. She had back pain from the accident, and walking has made it severe. Her physicians testified that the ankle deformity will cause abnormal stress on the ligaments of the knee and hip, and upon her low back where arthritis will develop.

In thus stating plaintiff's injuries, defendant's last point that the verdict of $24,500 is excessive is brought into focus. In attempting to buttress this contention defendant has cited several older cases of this court. Pitcher v. Schoch, 345 Mo. 1184, 139

S.W.2d 463, was decided in 1940, in which this court reduced a judgment of $18,000 to $13,000, where a 47 year-old-woman had suffered a compound, comminuted fracture of both bones of the left knee between the knee and the ankle, the injuries to the left leg being permanent. In Bowman v. Standard Oil Co. of Indiana, 350 Mo. 958, 169 S.W.2d 384 (1943), a $20,000 verdict to a 61 year-old-woman was successively reduced by the trial and appellate court to $10,000, there being a nonunion of a fracture of the left femur at the neck of the bone, injuries to the right shoulder with limitation of motion at the time of trial, injuries to the hip region and laceration on the right side of her forehead. Her condition was permanent. In Berry v. Emery, Bird, Thayer Dry Goods Co., 357 Mo. 808, 211 S.W.2d 35 (1948), an award of $30,000 to a 54 year-old-woman was held to be excessive by $12,000, where her injuries consisted of a painful, permanent injury to her left leg occasioned by a comminuted fracture of the right tibia and heel bone, and she had a fracture of the 3rd and 4th ribs on the right side.

The 1933 case of Christiansen v. St. Louis Public Service Co., 333 Mo. 408, 62 S.W.2d 828, is not particularly a guide for our present case because of its age, but an award of $18,000 was there reduced to $15,000 for an ununited fracture of the left hip of the femur.

■■ Defendant has pointed to no recent case where a verdict of $24,500 upon injuries comparable to those suffered by plaintiff here has been held to be excessive. In considering this question, the rule is that each case must be decided upon its own peculiar facts. Myers v. Karchmer, Mo., 313 S.W.2d 697. Plaintiff's age, and the nature, extent, and permanency of her injuries are paramount factors in determining if her award is excessive. Young v. St. Louis Public Service Co., Mo., 326 S.W.2d 107. The facts of the above-cited cases of defendant show considerable variance from the facts of injuries of the plaintiff here.

On the other hand, plaintiff has cited two recent cases on injuries similar to those here, which cases are more helpful in applying the rule of maintaining a reasonable uniformity of amounts of verdicts. De Mariano v. St. Louis Public Service Company, Mo., 340 S.W.2d 735, involved a consideration of progressive and permanent injuries to a 46 year-old-woman, where the trial court reduced a $40,000 verdict to $30,000 which was allowed to stand by this court. Plaintiff there had sustained a subcapital fracture of the neck of the right femur with displacement posteriorly of the head of the femur in relationship to the neck thereof, and the plaintiff had never been able to walk without a crutch since the accident, and had restriction of movement of her hip and difficulty in getting down stairs, and she could not bend over to put on her right shoe.

In Humes v. Salerno, Mo., 351 S.W.2d 749, where there was little evidence of loss of earnings, and medical expenses amounted to $1,000 to $1,500, there was an injury from the bite of a vicious horse by which the 37 year-old-plaintiff suffered a fracture of the right fibula two or three inches below the knee, and an injury to the superficial peroneal nerve and damage to the leg muscle which caused an atrophy in the calf of the leg. The nerve was operated upon for a neuroma and there might have been another one in the area which would have to be removed. Plaintiff there was ambulatory and working, and his doctor said he would eventually be able to do without a leg brace. A verdict of $30,000 was reduced by this court to $23,500.

Here, plaintiff's residual and permanent injuries primarily consist of a painful, disabling injury to her left ankle and leg, and her left foot, with deformities; a complete loss of her left kneecap with resultant weakness and instability; some arthritis is already developing in the ankle and foot, with a prognosis of more arthritis developing in the future, even to the low back by reason of the stress placed thereon from the deformed foot. Considering plaintiff's age and the severity and permanency of her injuries, we are not persuaded that the verdict herein is excessive, and this point is ruled against defendant.

The judgment is affirmed.

BARRETT and STOCKARD, CC., concur.

PER CURIAM.

The foregoing opinion by PRITCHARD, C., is adopted as the opinion of the Court.

All of the Judges concur.